Filed 4/14/21  In re Henry P. CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re HENRY P., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JANE W.,<br><br>    Defendant and Appellant. | G059316<br><br>(Super. Ct. No. 18DP0310, 18DP0310A, 18DP0310B)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Jeremy D. Dolnick, Judge.  Reversed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

\*         \*         \*

This dependency case arose out of what may have been a miscommunication, or maybe it was an outright lie.  David P., father of then 12-year-old Henry P., accused his wife, Jane W., of domestic violence, apparently because he did not want her to leave him and take their son with her.  Jane was arrested as a result of David's accusation.  After her release from custody, she obtained a restraining order against him.  David responded by seeking his own restraining order because he wanted to "delay the process."

After a court granted both restraining orders, the Orange County Department of Social Services (SSA) initiated an investigation, which suggested David had committed previous acts of domestic violence against Jane.  Under the terms of their restraining orders, the two were endeavoring to live separate lives in the same home.

Unfortunately, things devolved further after David tested positive for methamphetamine, was barred from the family home, and Henry was removed from his custody.  The family could not afford to maintain two residences, and Jane made arrangements to move with Henry to Florida, where they could live with her mother.  SSA was initially receptive to that option, but when it learned that Jane agreed to allow David to be in or around the family home, and the two of them engaged in an altercation with Henry nearby, Henry was removed from Jane's custody as well.

After 18 months of reunification services, the juvenile court concluded Henry could not safely be returned to Jane's custody in Florida and ordered that he remain indefinitely in foster care.  Jane appeals that order, arguing it is unsupported by substantial evidence.  We agree.

The record lacks evidence sufficient to support the conclusion Jane is a perpetrator of domestic violence, rather than a victim of it, and there is as a result no

2

support for the conclusion reached by both SSA and a case manager in Florida that Jane lacked insight into her role in causing the dependency and that she was not doing enough to address her problems.

The Florida case manager reported in June 2019 that Florida's denial of a requested placement pursuant to the Interstate Compact on the Placement of Children (ICPC) was based largely on Jane's refusal to acknowledge her role as the perpetrator of domestic violence. This position was not supported by substantial evidence, but SSA made no attempt to correct the apparent mistake. If such a clarification is now made, it may well alter Florida's view of the case, and thus its willingness to accept the ICPC.

The juvenile court's finding that Jane "has not demonstrated that she's capable of parenting the minor in a safe and healthy manner" both misstates and misapplies the burden of proof. The proper burden which must be borne by SSA requires SSA to establish not merely that Jane is a flawed parent, but that the return of Henry to Jane's custody would create a significant risk of either physical injury or a particular type of serious emotional injury.

Even assuming the court's finding that removing Henry from his current foster placement "would risk causing long-term emotional trauma for the minor" applied the proper standard, there is insufficient evidence to sustain it. The record is devoid of any opinion along this line offered by Henry's therapist, or by Henry himself. And the circumstantial evidence suggests the contrary, reflecting that Henry has actually shown remarkable resilience throughout the course of this dependency action.

Finally, the fact that Henry has a strained relationship with Jane does not qualify as a basis for denying reunification. If it did, SSA should have offered Jane services designed to ameliorate that specific problem, which developed during the course of the dependency proceeding. Instead, the record suggests SSA ignored the problem (including the evidence that David may have been the catalyst for it), insisting that it was entirely Jane's responsibility to restore her relationship with Henry.

3

We consequently reverse the juvenile court's order terminating reunification services to Jane and ordering that Henry be placed in long-term foster care.

## FACTS

The issues presented require that we set forth the facts at some length.

SSA began investigating Henry's situation in January 2018, when he was 12 years old, after both parents sought and were granted temporary restraining orders against each other. Henry's school principal "expressed concern for the family due to Henry's school refusal and she is aware of problems between the parents." She also relayed that Henry appeared to be well taken care of and was "clean, well fed and healthy." The principal described David as "'prone to anger and can be irrational.'"

Between January and April, SSA engaged with the family informally; this contact included encouraging the parents to participate in a Child and Family Team (CFT) meeting aimed at addressing their problems. At a CFT meeting on March 29, 2018, David was reported to be initially argumentative and disruptive; he spoke over Jane and did not allow her to talk. When David left the room to use the restroom, Jane expressed her fear of him, stating he had yelled at her the previous day and in the car on the way to the meeting. She stated she did not want to be alone with David and was afraid of what might happen when they left. She also stated Henry was aligned with David who had convinced Henry not to listen to her.

The social worker advised Jane to leave the meeting separately, and then to take Henry and leave the family home for safety reasons. When the meeting continued with David alone, he informed SSA that Jane was "abusive" with Henry, had no respect for Henry's boundaries, and offered examples of what he believed was her improper treatment of Henry. The social worker informed David that while Jane's tactics may not be the way he would choose to parent, it did not rise to the level of emotional abuse.

4

With the assistance of the social worker, Jane left the home with Henry. On that same day, SSA obtained a protective custody warrant for Henry, removing him from David's custody. David was served with the warrant at home.

The next day, Jane spoke with the social worker. She was "frantic" because she had been placed in a motel only for one night. She asked if she could move to Florida, but was "advised she needed to attend court." She was provided with a list of additional domestic violence shelter resources.

By April 2, Jane was still at the motel with Henry, due to the unavailability of any shelter. When the social worker inquired about her motivation to move to Florida, Jane explained her mother lived there and could help care for Henry while Jane was working. Jane reported Henry was not handling being out of the home well; she said Henry's neurologist advised that he not live in a shelter or outside of his home. Jane said David abused Adderall and alcohol and that he received disability benefits for his depression. She added David was alienating Henry against her by telling Henry that she "is an angry person and that she needs help." But she nonetheless believed it was best for Henry to be with both parents in the same home, and it was her intent to reconcile with David if he got appropriate treatment.

David also expressed a desire to reunite with Jane and noted it was not financially feasible for the family to live apart. He stated that "he is the only parent that can get Henry to school and to do things."

The formal dependency case was initiated on April 2, 2018. SSA alleged that jurisdiction was proper under Welfare and Institutions Code[1] section 300, subdivision (b), on the basis there was a substantial risk that Henry would suffer serious physical harm or illness. The petition alleged Henry's parents put him at risk by engaging in domestic violence when he was in the home, and by violating the terms of

---

[1] All further statutory references are to this code unless otherwise noted.

5

their restraining orders. Additionally, David had a history of mental health issues and substance abuse.

The petition also alleged Henry had special needs and had been diagnosed with autism, school officials had expressed concern about his refusal to attend school, and he expressed feeling "kinda sad" when he observed his parents arguing.

In its initial detention report, SSA identified the basis for the case to be "ongoing domestic violence with the child in the home. The child . . . reportedly has autism and difficulties in school." Jane was reportedly fearful of David, and SSA was "worried the parents will continue to engage in incidents of domestic violence in the child's presence placing the child at risk of emotional harm or neglect."

At the initial detention hearing, the court ruled David could remain in the home with Jane and Henry, under the terms of the protective order requiring they refrain from domestic violence, refrain from making disparaging comments about each other, and comply with all recommendations of SSA.

After the case was initiated, the social worker interviewed Henry. He explained he lived at home with his mother and said things "were a little complicated right now" because his parents were not getting along. Henry acknowledged he saw his parents arguing, but denied witnessing violence. He stated that his father was often at the house to take care of him because his mother worked.[2]

Jane told the social worker that continued adherence to the plan under which the parents had occupied the home on alternate days and nights was not practical because of her work schedule and the inability of David to afford the expense of regular

---

[2]     Jane, who worked as a Lyft and Uber driver, was the family breadwinner, while David was Henry's primary caregiver. Jane testified in July 2018 that David had not been employed in 10 years, which was a source of tension between them. David receives disability benefits, totaling about $1,800 per month for the family, including a $300 payment to each Jane and Henry.

6

hotel rooms. David informed the social worker he "would like to work things out" with Jane and was open to receiving counseling for that purpose.

On April 13, 2018, David tested positive for methamphetamine; on April 20, the court again granted SSA's request for a warrant removing Henry from his father's custody and leaving him in Jane's sole custody. Jane expressed concerns about her ability to care for Henry without his father's support, and about where David would go if he could not stay in the home.

On April 23, Henry's school principal and school psychologist reported that in their interactions with the parents Jane seemed "sedated and subdued," while David "gets upset and overreacts." Henry's school attendance was inconsistent—56 absences (38 unexcused) in the current school year—and the parents failed to encourage attendance. The principal and psychologist felt that Henry was "in control at home" and if he did not get his way, he had tantrums until the parents gave in.

On April 24, SSA filed an amended jurisdictional petition, again alleging jurisdiction was proper based on failure to protect under section 300, subdivision (b). The petition alleged the parents were unable to provide regular care due to "mental illness, developmental disability, or substance abuse."

The amended petition alleged the parents had an unresolved problem with domestic violence, citing an incident in the summer of 2017 in which David "squeezed [Jane's] head, causing marks on the side of her face," and an incident in October of 2017 in which David was arrested for willful cruelty to a child, and false imprisonment after Jane reported that David "threw her down and pushed her on the floor a number of times." A third incident in January 2018 was also alleged; it characterized Jane as the perpetrator but noted David "reported that he called law enforcement because he did not want [Jane] to leave the home, and [she] was arrested because he was observed to have a red mark on his wrist."

7

When interviewed by the social worker in January 2018, David admitted engaging in the alleged acts of domestic violence against Jane. Specifically, he acknowledged squeezing Jane's head. He also acknowledged committing the October 2017 domestic violence incident,[3] but he claimed that "since his arrest in October he has not laid a hand on his wife."

With respect to the January 2019 incident in which Jane was the alleged perpetrator—the incident that resulted in the restraining orders that caused SSA to become involved—David "acknowledged calling police because he did not want his wife to leave the home." He claimed that Jane "was arrested against his wishes as they had seen a red mark or injury on his wrist." David conceded that when Jane obtained a restraining order against him after being released, he "requested a restraining order against [her] in order to delay the process."

At a hearing on May 1, 2018, Jane opposed the idea of David moving back into the family home, but asked David for financial assistance in paying her rent because he did not contribute financially while he was living elsewhere. She requested, as an alternative, that she be allowed to move with Henry to her mother's house in Florida, where she would have more family support and not be required to pay rent. SSA opposed both requests, and argued it would not be able to supervise Henry sufficiently if he were in Florida. David also objected to Henry moving out of state. The court denied both of Jane's requests.

Two weeks later, both parents pleaded no contest to the amended petition and stipulated to a plan that released Henry into Jane's custody under a program of intensive supervision. Thereafter, a social worker with CRISP (Conditional Release to Intensive Supervision Program) made six visits (some announced and some

---

[3] According to a contemporaneous report of the October 2017 incident, it also arose as a consequence of Jane telling David she was going to divorce him and move to Florida with Henry.

8

unannounced) to Jane and Henry's home in June and July, finding Henry to be safe with Jane. Jane again expressed her desire to move to Florida. Henry overheard the conversation and stated he did not want to move to Florida.

The dispositional hearing commenced on July 24; the social worker testified she spoke to Jane's mother, who was willing to have Jane and Henry live with her. The social worker believed the maternal grandmother would provide support for Jane and Henry and would be willing to assist with Henry's care. The social worker recommended the court allow Jane to move to Florida with Henry.[4]

Both Jane and David were present at the hearing. Jane testified, explaining the couple's recent history of domestic violence in which David had been the perpetrator. She attributed David's increasing belligerence and sporadic violence against her to his consumption of alcohol along with increasing amounts of his prescribed Adderall medication, adding that he had been a gentle person previously.[5] Jane also acknowledged she had pushed David on a couple of unspecified occasions out of frustration, but she insisted she had never hurt him.

Jane denied having engaged in any violence during the incident in January 2018 when David called 911 to accuse her of domestic violence. She explained (consistent with David's own admission) that he had done so in response to her announcement that she planned to leave him and take Henry with her.

Jane also testified that if she were able to secure the funding for housing, it "would be the best possible situation for [Henry] to stay in his home and have continuity

---

[4]    The social worker also explained that wraparound services had been providing financial assistance to help Jane afford her rent over the past two months, but that the maximum period allowed for such rental assistance was three months.

[5]    SSA was also "concerned the father is overusing prescription drugs and is seeking out physicians who will prescribe him what he requests. [He] has inconsistent drug testing results which does not coincide with the father consistently taking prescription medication as medically prescribed."

and routine. All children need routine, but he needs a lot more than others, a lot more." She stated that if her ability to afford rent were not a significant problem, she would not be moving to Florida.

On July 25, the dispositional hearing was continued to August 6. On July 31, when the CRISP social worker made an unannounced visit, David was in the pool area of the apartment complex. Jane and Henry denied David had been in the home. On August 2, SSA received a notification from the Child Abuse Registry that David had been living in a garage, but that Jane had allowed him back into the home due to the hot weather. Additionally, the reporting party stated that the paternal aunt had received a text from Henry asking her to call 911. When Jane was notified of Henry's text, she stated everything was fine, but David could be heard "yelling in the background that he has marks on both arms because the mother had attacked him." David also stated he was going to call the police.

The social worker interviewed the family members about the incident that same day. According to Jane, who spoke to the social worker via telephone, the incident occurred when David came to the home to retrieve his mail; he then became angry because he wanted to stay in the home and did not want Jane to take Henry to Florida. Jane said she and David had argued at the front door, while Henry was in the living room playing video games, but David did not enter the residence. She confirmed she had grabbed David by his arms during the incident, "but he twisted away which resulted in the bruises on his arms." At the conclusion of their telephone interview, the social worker told Jane not to contact David about the incident, to let the social worker speak with him directly.

The social worker then spoke to David, who was having a monitored visit with Henry in a nearby room. David said he had met Jane at the mailbox, but claimed it was Jane who was upset because Henry had been talking to the paternal grandmother and paternal aunt at David's urging. Jane wanted to continue the argument in the house, and

she grabbed the father by the arms, which left bruises. Despite the social worker's warning to Jane that she not contact David about the incident, Jane made several efforts to contact him via telephone and text during his interview with the social worker.

When the SSA social worker later spoke to Henry about the incident, he denied it. But when he was asked if he felt safe going home with Jane, Henry stated Jane is sometimes '"kinda mean"' and upsets him. Henry stated he was aware Jane had borderline personality disorder because his father had told him that. Henry was aware his father could not be in the home, but wished he could be.

Henry's paternal aunt was also interviewed. She identified herself as a "former CPS worker" and stated she has severe concerns about both parents. She described David as "struggl[ing] with substance abuse and mental health issues while [Jane] is manipulative and plays the victim."

Based on those concerns, SSA recommended that Henry be immediately removed from Jane. The court ordered the detention on August 3; when Henry was informed that he was being removed from Jane, she "made comments to the child, which escalated his emotional distress."[6] Henry began to hyperventilate and engage in a tantrum; medical aid was called to transport him in restraints.

---

> [6] The specific comments Jane made are not reflected in the record. The jurisdiction and disposition report, dated September 6, 2018, states only that the social worker "allow[ed Jane] to say bye to the child if she agreed to assist . . . with getting the youth to cooperate. The mother agreed to do so, but was coming up with scenarios as to how the youth may respond. [The social worker] asked the mother to stop coming up with scenarios and assist in getting the youth to cooperate. . . . [¶] The mother went into the home and hugged the child who was seated on an ottoman while [the social worker] explained what was happening to the youth. Henry stated he did not want to go. [The social worker] explained it was not a choice, it was the judge's order and he could not stay in the home. The mother attempted to add comments which made the situation worse; therefore [the social workers] and the officers asked the mother to stop with the comments. The youth leaned against the mother who was holding him and cried."

In its August 6 report, SSA indicated David had "failed CRISP and was asked to move out of the home due to positive drug tests," and that Jane had "violated the CRISP order by allowing unmonitored contact on numerous occasions between the father and the youth and engaging in a verbal domestic dispute in the presence of the child." SSA noted that "[t]hroughout the history of the dependency case the mother's cognitive abilities and her ability to protect the youth . . . have been questionable." SSA also noted the August 2 incident "confirms the mother is unable to refrain from contact with the father and continues to engage in domestic violence with the father . . . ." The report concluded that Jane "does not follow directions well" and "lacks problem solving skills and relies on others including her parent partner and Social Services to resolve issues for her."

SSA filed a subsequent petition seeking to establish jurisdiction on the additional basis of emotional injury pursuant to section 300, subdivisions (b)(1) and (c). In support of that count, the petition alleged that Henry's parents continued to engage in domestic violence in violation of the juvenile court's orders, citing the August 2 incident as well as Jane's attempts to contact David about it after the social worker asked her not to. The petition also relied on Henry's history of inconsistent school attendance and testing in 2016 that indicated he disliked school, had low self-esteem, and problems with adaptability and leadership. It also alleged that in 2017, Henry's medical records noted that David "enjoys time with [Henry] and may be holding him back from growing up; the child states that he does not want to go to school and he stays home." It also alleged that, in March 2018, both parents were observed to answer for Henry during psychiatric sessions, and in May 2018, when Jane finally agreed to allow him to meet with a psychiatrist alone, she was found listening at the door throughout the appointment.

On August 7, David called the social worker, accused Jane of suffering from borderline personality disorder and "expressed he is fearful of her and requested a protective order." The social worker advised him to contact law enforcement or go to

12

court to request a restraining order. David told the social worker that he "believes [Jane] was also doing these things to the child, Henry, and threatening him not to tell [the social worker]." David nonetheless "made comments which alluded he would rather have the child in the care of the mother than a foster home despite his concerns."

On August 8, David called the police to accuse Jane of domestic violence, and she was again arrested. The incident occurred at home the day after a "Child and Family Team" meeting. Jane and her mother were engaged in a FaceTime session. David claimed they were ridiculing him, and when he tried to leave the room, Jane blocked his exit and "was hip checking him, pushing and shoving him." In response, he called 911. The police responded and arrested Jane.

Jane was separately interviewed about the incident, and according to the social worker, she "confirmed she attempted to block the father from exiting, but he was able to get around her." Jane claimed David had "lied about the incident," but the social worker concluded it was Jane who was "minimiz[ing] the incident."

At the detention hearing on August 14, Jane submitted on the issue of detention. The court ordered that visitation be monitored for both parents—rather than only supervised—explaining that it was concerned the parents would discuss the case with Henry or make derogatory comments about each other to Henry, during visitation. However, the court gave SSA discretion to liberalize visitation as it deemed appropriate.

On August 22, the social worker received a voicemail from Jane's mother in Florida, expressing concern about Jane's emotional state. She related that Jane had "been having to stay in the apartment with [David] . . . and I think she's headed for a nervous breakdown." Jane's mother expressed fear that Jane might be suicidal. She urged Jane to come to Florida and offered to buy her a plane ticket. Jane demurred, which her mother attributed to the fact she was "incapacitated."

13

On August 23, Henry's school psychologist left a voicemail informing the social worker that both parents were at Henry's school that day, which was the first day at his new middle school. She described Jane as someone who was "difficult to have a conversation with and had difficulty listening." Both parents attempted to have contact with Henry. When asked about that incident, Jane explained she went to the school to meet with the psychologist, although she did not have a meeting scheduled. She wanted to "share information about the child's situation and his health." She claimed she was looking for the psychologist, rather than trying to make contact with Henry.

During September 2018, the visitation monitor reported that Jane had several positive visits with Henry, which included her reading to Henry while he laid down with his head in her lap.

When SSA filed its initial case plan on August 31, 2018, SSA expressed its "concern[] the family does not have a local support network." One of Jane's service objectives was to "[d]evelop positive support systems with friends and family." Her other objectives were to obtain and maintain a suitable residence for herself and Henry, to refrain from behaving in a manner that is verbally, emotionally or physically abusive or threatening, to refrain from involving Henry in attempts to control or intimidate his father, and to express anger appropriately.

On September 25, the court entered its dispositional order pursuant to stipulation. The court found that giving custody to the parents would be detrimental to Henry, and vested custody with SSA. The court ordered monitored phone calls and visits for both parents, indicating that "[a]ll visits and phone calls [were] to be at the child's discretion."

By October 9, the day of the 15-day review hearing, Jane had moved to Florida to live with her mother. Henry was still at Orangewood, as no suitable placement

14

had been located.[7]  Henry reported he did not like Orangewood, but he had anxiety about going to a foster home.  He had been assigned a therapist and a psychiatrist.  The report noted that Henry was "diagnosed with Autism although he is high functioning and can care for himself with supervision and reminders."

On October 21, staff at Orangewood reported that Henry was "a pretty good kid," but noted "he sometimes gets upset and will have a minor tantrum if he can't get his way."

On December 5, 2018, Jane's counsel reported she had begun counseling and completed a four-hour parenting class and was taking domestic violence classes.  She requested the court initiate a request to Florida under the ICPC, so she could qualify for services in Florida and seek to have Henry returned to her care in that state.  She also asked the court to permit her to have unsupervised telephone calls.

SSA opposed the unsupervised phone calls, explaining that Jane "has a history of doing things that kind of set [Henry] off, behaviorally."  The court denied Jane's request for unsupervised telephone calls, but ordered an expedited ICPC request to the State of Florida.

Also in December 2018, Henry was placed in the foster home where he has remained since.  The foster mother reported that she notified Jane her daily monitored phone call would take place around 7:30 p.m.; a few days later, on a single morning Jane texted her 24 times requesting to speak with Henry.  The foster mother additionally reported that Jane frequently asked Henry if he felt sad or if he wanted to cry, when he had not expressed those emotions.

---

[7]      SSA reported that Henry had a paternal grandmother in northern California, a paternal aunt in Oregon and his grandmother in Florida who were each willing to have him placed with them.  However, Florida was not considered an option since Jane was living there; and more generally, an out-of-state placement was not considered an option as it would interfere with the father's visitation, and because Henry had a "school of origin" order that prohibited changing his school.

By January 24, 2019, Jane had completed a 10-week personal empowerment course and was participating in therapy. SSA stated that although she had a daily monitored phone call with Henry, and a monitored FaceTime session two to three times per week, she continued to contact the foster mother numerous times per day asking to speak with him. She also had to be redirected about the topics she was choosing to discuss with Henry during the phone calls, as she wanted to discuss her case plan, the foster family and their home and neighborhood among other things.

During the six-month review hearing in March 2019, Henry was reported to be doing well in his foster placement and at school. SSA reported Henry was receiving a daily dose of Sertraline (Zoloft), and that despite his "previous Autism diagnosis," he "does not exhibit symptoms or characteristics of Autism Spectrum Disorder."

Jane was reported to have made "substantial progress in her case plan services," noting her completion of parenting education and Personal Empowerment Program courses, and her participation in therapy. On March 6, Jane completed a psychiatric evaluation, which concluded she "is exhibiting signs of depression and anxiety, as evidenced by depressed mood, symptoms controlled by treatment, shortness of breath/smothering, recurrent recollection of a past event, symptoms controlled by treatment." Jane's appearance was described as "well-groomed and casual," and her attitude and behavior "show[ed] signs of being normal and tearful." The recommendation was to increase her dosage of Celexa and to continue therapy.

On March 18, Jane's therapist reported she had attended nine sessions of therapy to "treat emotional trauma from prior domestic and/or sexual abuse/assault." She indicated Jane had been "fully cooperative and participates well in each session."

By contrast, David's participation in his case plan was "minimal." He had not enrolled in any required classes or substance abuse programs and had not obtained stable housing or employment. However, his visitation with Henry was consistent.

Despite Jane's progress, SSA recommended that the court find the return of Henry to the physical custody of his parents would create a substantial risk of detriment to his physical or emotional well-being.

The six-month review hearing was continued to May 8, 2019. SSA reported that when Henry was asked about his desire to move to Florida, he said he did not want to move to Florida or live with his mother, explaining that he loved his school and "'wouldn't have [his] teacher if [he] moved to Florida.'"

The report also reflected that on April 25, 2019, Jane was contacted by a case manager in Florida about scheduling an appointment to be fingerprinted; she was told that once a background check was complete, a home study could be scheduled. The case manager met with Jane and her mother in their home on April 29. On May 6, the case manager sent a letter to SSA noting that Jane had provided a budget indicating she would "be financially dependent on the MGA income and has stated she is working on obtaining full time employment"; the case manager expected she would need three more home visits to complete the assessment.

With respect to visitation, the report reflected that Henry had daily phone calls with Jane except on the days when he has visitation with his father. Jane complained that Henry cut the phone calls short due to not wanting to talk or wanting to go play video games. Jane was "advised . . . that it is her responsibility to engage the child."

Henry reported his "favorite thing is seeing my dad and being able to spend time with him." On April 27, 2019, David was arrested and held in local custody with no release date. On May 8, David stated "[a]s much as I love Henry and want him with me, I don't have the funds or means to have him with me right now." David also lacked stable housing.

The court continued the six-month review hearing to June 13, 2019. In an addendum report, SSA reported that the Florida case manager had suggested Jane should

17

participate in "in-home parenting" and "anger management" classes. She acknowledged that Jane had already completed a parenting class, but noted the class could not be an "in-home" class because Henry was not residing in her home.

Jane continued to have issues with her telephonic visits with Henry. She reported to the social worker that Henry "blames her for the entire dependency case and whenever [she] attempts to 'explain what really happened' . . . [he] becomes upset and calls her a liar." The social worker told Jane she would discuss with Henry "the importance of his phone calls with you."

The six-month review hearing was again continued to July 18, 2019. In an addendum report, SSA stated that the Florida case manager sent a "Notice of Denied Home Study" via e-mail on July 15, 2019. The notice was supported by a lengthy, unsworn report signed by the Florida case manager, detailing why she did not recommend reunification at that time.

The case manager believed Jane continued to minimize her acts of domestic violence; she was not self-aware about her own role as a perpetrator. She noted Jane "would also spend much of the time trying to convince [the] case manager she was a victim in the removal and would act out situations of her being thrown to the ground or blocking her husband from leaving a room. [Jane] would also make [an] effort to use terminology she learned [in domestic violence classes] called 'gaslighting' to describe how her husband set her up and lied to the cops. She appeared to do this to bring more strength to her argument of being a victim when [the] case manager would ask for clarification on details."

The case manager noted Jane became quickly agitated. She also thought Jane "struggled to stay focused" and "would bring up her husband and retell what he has done to her" and that Jane improperly blamed her husband for any negative feelings

18

Henry had about her. In the case manager's opinion, 12-year-old Henry was "able to form his own thoughts."[8]

The case manager noted Jane continued to be in touch with David since she moved to Florida, and she had continued to send him money. She felt that "does not demonstrate adequate skills of being protective based on [Jane's] statements of viewing her husband as dangerous."

The case manager observed that Jane repeated the same story several times over the course of their visits, seemed to have difficulty remembering information that had been imparted, and "would call often to inquire on the exact same information case manager provided the mother [one] hr before on the phone."

The case manager also spoke to Henry, who told her he did not want to live with Jane in Florida and that she "'kind of scares me.'" Henry thought Jane asked him too many questions in their telephone conversations, like "'where are you'" and "'what are you doing.'" The case manager thought that Jane and Henry should participate in telephonic family therapy.

Henry informed the case manager that the reason he was removed from his parents' custody was because "'mom freaks out and doesn't know what she is doing and dad was trying to protect me because it made us both upset.'"[9]

The case manager concluded that Jane's therapy and mental health evaluation were both based on Jane's self-reported information that she was a victim of domestic violence, rather than a perpetrator, which skewed all of the assessments. Specifically, she noted that Jane had completed classes with a company "designed to

---

[8]    At another point in her report, the case manager stated Henry was 13, rather than 12.

[9]    By contrast, in September 2018, shortly after Henry was removed from Jane's custody, he expressed the opinion that "this whole situation was [the social worker's] fault.

assist victims," despite the fact she "behaved in a manner common with an aggressor of DV along with her reporting being arrested twice for DV against her husband."

The case manager recommended that Jane engage in anger management classes, which she said was a listed task on Jane's case plan—although Jane maintained she was not required to complete anger management classes.[10] She also suggested Jane would "benefit from completing an evaluation with provider Valerie Fisher for domestic violence and anger management." Fisher is a provider who works specifically with perpetrators of domestic violence.

SSA's addendum report also related that Henry was continuing to do well. Henry's therapist reported that he had been attending therapy consistently and had a positive attitude. They had been working on "issues related to his mother. He has quite a bit of negativity towards her." They were also working on "improving his communication with her." On July 9, Henry told the social worker that his phone calls with Jane "aren't as bad anymore."

At the six-month review hearing, the court concluded Jane's progress toward completing the goals of her case plan was "moderate," while David's progress was "minimal." As a result, the court concluded Henry could not be safely returned to his parents' custody and ordered Henry to remain in foster care. The court set the 12-month review hearing for September 25, 2019.

In its 12-month review report, SSA reported that Jane had made moderate progress in her case plan services, had enrolled in a parenting education course in Florida pursuant to a referral from the Florida case manager, was continuing to participate in individual general counseling, and continued to call Henry regularly.

---

[10] Jane's initial case plan does contain a requirement that Jane complete an Anger Management Program.

20

However, although the Florida case manager referred Jane to a domestic violence program run by Valerie Fisher, Jane declined to participate since she was the victim of domestic violence, not the perpetrator.  She requested that SSA contact her previous domestic violence counselor in the program she had already completed.  When the social worker contacted that earlier provider, Jane's counselor expressed confusion at the referral of Jane to Fisher because Jane was described as being the victim of domestic violence and "[i]t's hard for us to see someone as a perpetrator and as a victim because while in a domestic violence relationship, one partner is maintaining power and control over another."

Jane's therapist provided a report stating "Jane's symptoms meet the criteria for Adjustment Disorder with mixed anxiety and depressed mood . . . as evidenced by the development of emotional or behavioral symptoms in response to an identifiable stressor (conflict with husband, son removed from home) occurring within 3 months of the onset of the stressor; significant impairment in social, occupational, or other important areas of functioning (sadness, guilt, constant worry, prompted move to Florida, interference with job search); [t]he stress related disturbance does not meet the criteria for another mental disorder and is not merely an exacerbation of a preexisting mental disorder . . . ."

The therapist rated Jane "highly motivated and able to participate in treatment."  She opined that "Jane will be ready for discharge from counseling when she feels increased feelings of happiness and decreased sadness.  As evidenced by ability to enjoy her life and not feel overwhelmed about her separation from her son."

David's progress in his services was evaluated as "moderate."  He was regularly drug testing and engaged in individual therapy, but refused to attend any 12-step program.  He had not yet secured employment or stable housing.

Henry was reported to be "comfortable in his placement, in the presence of the caregivers, and with his father during visitation."  His court appointed special

21

advocate (CASA) reported that Henry's therapist said "they are working on his relationship with his mother and his feelings toward her. He is gaining insight into his reactions and behavior toward her." Henry told the CASA that he liked his current living situation, and his foster mother told her that Henry "wants to stay with her until he goes to live with dad." Henry himself told the CASA that the one thing he is sure of is that he wants to live with his dad, and that he did not want to live with Jane "because she is crazy."

The CASA advocate nonetheless reported having "many concerns" about David, including that Henry had showed her "inappropriate video games that his father shares with him, some are very violent, and others have racist overtones with sexual innuendos." Also, she was concerned that David "criticizes Henry's mother and talks negatively to Henry about her as Henry believes everything his father tells him and then parrots what he says about his mother."

In its report, SSA recommended that reunification services be continued and an 18-month review hearing be scheduled. SSA's updated case plan for Jane included requirements that she participate in an SSA approved "Personal Empowerment Program," an "Anger Management Program," and participate in general counseling that focused on (among other things) "how to be more assertive." She was also required to cooperate and complete a "730 psychological evaluation" and a "Parenting Education Program."

On September 20, Jane filed an ex parte application for an order to facilitate her telephone and FaceTime visitation with Henry, claiming the "caregivers are not acting as neutral parties to assist [her] in having meaningful court ordered contact with her son." She argued that Henry "should not be in a situation where his attention is divided during [her] phone visits and caregivers should be respectful, by not talking in the background with family/friends[] during [her] phone visits. [Henry] should have a

22

safe place to express himself; where he can talk openly with his mother without feeling as though he is going to get into trouble."

The court granted the request pursuant to stipulation, ordering that SSA was to "make best efforts to maintain consistent contact between mom and child. Caregivers not to interrupt or interfere with phone calls/FaceTime unless mom violating visitation guidelines. Social worker to work with mom and caregivers to set consistent call schedule per court's previous visitation orders."

The court continued the 12-month review hearing to November 6, pursuant to stipulation. Jane requested that it be set as a contested matter, as she was requesting to have Henry returned to her custody. Jane also asked to initiate a new ICPC, arguing that she believed the first one was wrongfully denied and she had been given no opportunity to appeal that denial.

SSA opposed Jane's request, arguing it would be "fruitless and premature" to initiate a new ICPC because the Florida social worker said there is no way they will approve an ICPC until Jane is "engaged in all the services." It pointed out that Florida's concern was that Jane had "completed a program for victims [of domestic violence] rather than perpetrators," even though Jane's "perpetration of domestic violence is what has brought the family to dependency."

The court stated that Florida's acceptance of the ICPC is "voluntary on their part," which is why there is no appeal process from Florida's denial. The court agreed to order another ICPC, but considered it an "uphill battle" for Jane because "the bottom line was, she hadn't completed enough services in the appropriate areas for the receiving state, Florida, to be satisfied that they would, in fact, wish to accept the case." The court noted that if Jane "wants to make this more likely to be accepted, then she does need to do everything and then some; for instance, the correct domestic violence counseling and training programs."

23

The court also warned Jane that the request for a new ICPC "may be very premature, and that's a gamble if she does wish to have that start now" because "there's not going to be another one of these authorized" and so "if she doesn't have enough, then she's going to lose the opportunity to have that initiated at a better date."

On November 25 and December 2, Jane contacted the social worker to discuss the quality of her phone calls with Henry. She complained that the calls were short and frequently "interrupted by everyone in the background." The social worker advised Jane to "focus on the youth and his well-being during phone calls, rather than everyone else in the background." Jane also complained that Henry's therapist "was supposed to help us with our phone calls" and assist us in "fostering a loving relationship," but she had only called Jane once and told Jane she "should be happy with eight-minute phone calls."

On December 10, the 12-month permanency hearing was continued to January 21, 2020, and the court ordered unsupervised visitation for David. In an addendum report, SSA reported that David was still homeless, and not yet employed. David included he felt he was being "set up and not supported" by SSA. He asked if SSA could do more for him because "I've gone through trauma and have been a victim. I'm trying here."

Jane continued to express concern about the quality of her phone visits with Henry, stating their calls are "for a maximum of 15 minutes, rather than engaging in 'real conversation, you know?'" She also asked the social worker to stop relating to Henry that the phone calls were at his discretion because "he uses that against [me]."

Henry complained that Jane "calls 100 times a day." When the social worker encouraged him to give his mother his undivided attention during the phone calls and engage in conversation with her, he "rolled his eyes."

The 12-month review hearing took place on January 21. Jane was not present, but her counsel was authorized to proceed in her absence. Counsel related that it

24

was Jane's intention to relocate to California because she had decided that would be the best way to re-establish a good relationship with Henry. She asked for referrals for housing and possible employment. The court ordered SSA to make best efforts to work with Jane in providing those services.

The court found that reasonable services had been provided to both parents, and that both Jane and David had made moderate progress. It also found that returning Henry to parental custody would create a substantial risk of detriment to his physical or emotional well-being, and set the case for an 18-month permanency review hearing on February 3, 2020.

On January 27, Jane sent an e-mail to the social worker, asking about "the progress on you finding a new therapist for Henry and I to do dual therapy over FaceTime . . . Henry needs to know that I had to leave to [Florida] because I could not be homeless. David refused to get any kind of employment so we could not pay our rent I need t[h]erapist to help Henry understand this."

On January 29, Jane followed up regarding the dual therapy. When the social worker responded that she needed time to find a therapist, Jane pointed out that she had initially requested the joint therapy "months ago."[11]

With respect to housing, the social worker was told by a representative of Mercy House that although Jane qualified for housing, she may "run into some issues looking for housing" in Irvine because her "name was also on the rental agreement when [David] was evicted from their apartment back in December 2018." The Mercy House representative said he was going to discuss the matter with the Irvine Company to see if an exception could be made.

---

[11]    Jane initially requested therapy for her and Henry together on August 9, 2019.

25

On January 28, the Mercy House representative reported that the Irvine Company concluded that Jane's rental "isn't going to work out." The representative thought Jane might be able to appeal the eviction on her record based on her claim that she had fled the apartment to escape domestic violence. David later contacted Mercy House claiming it was he who was the victim of domestic violence and asking for similar help.

Based upon the frequent communications between Jane and David, and the fact that each of them had asked the social worker about the other's case plan progress, the social worker believed the parents "continue to engage in a codependent relationship." The social worker "continues to remind [them] that [the] Court addresses parents' progress individually, not together."

On January 31, SSA filed a status review report recommending that Jane's and David's reunification services be terminated, and that Henry remain in his current foster placement, as he was not a proper subject for adoption. SSA reported that Henry was doing well in his foster placement, and had expressed a desire to stay there until he could move in with David. He did not want to live with Jane. Henry's therapy was reported to be doing well.

The 18-month review hearing was further continued to June 3. SSA related in a report that Henry's therapist advised that Henry was "'coming to the end of his extension of sessions.'" She believed that facilitating joint therapy between Henry and Jane would be "'too difficult over the phone.'" However, she was willing to facilitate joint therapy between Henry and David, in place of Henry's current individual sessions.

In March 2020, the social worker contacted Jane about housing. Jane emphasized her desire to move back to Irvine. The social worker explained her housing options would be greater if she was open to residing in another city; Jane responded that she "'feels safest in Irvine and it is Henry's favorite city.'"

Henry continued to complain that he did not enjoy his phone calls with Jane, which "never get better." He thought she "always focuses on other people in [the foster's house] instead of just talking to me and she always gets mad at [the foster mother.]" On April 8, Henry reported that Jane was still "annoying so I just have to kinda be mean to her and be bossy." However, on May 19, Henry reported that his phone calls with Jane were "[p]retty good, actually." He said that Jane was driving for Postmates and they talk about that. He said he was happy for her. As a consequence, on May 21, SSA authorized Jane to participate in an additional weekly call with Henry.

On June 3, the 18-month hearing commenced, with all parties appearing remotely, due to COVID-19 related court closure. SSA introduced its reports into evidence; the social worker did not testify.

Jane testified that her relationship with David was a bad one due to his problems with medications, addiction and violence, and that she should have gotten out sooner before subjecting Henry to the situation. Jane explained David had begun misusing his prescribed Adderall—taking all the medication very quickly, and then going back to the doctor to try to get more.

Jane also confirmed her completion of a domestic violence program, two parenting classes, and a Personal Empowerment Program. She explained how she had benefitted from her domestic violence program, and learned that she had responsibility for what happened to Henry because their family dynamic was similar to some that were "vilified by that class." She also learned to spot the warning signs of domestic violence and the importance of making a plan to get away from a situation that is unhealthy.

Jane talked about her parenting class and the insights she had gained about how to interact more productively with Henry. She also stated she intended to continue with weekly therapy, although she had been told that her therapy goals were being met, and she was not required to continue.

Jane stated that if Henry were returned to her custody, she would take him to therapy, and she also wanted to engage in dual therapy with him. She was concerned about the fact Henry had harbored the belief for two years that he would live with David, which was not a viable option because David never made any plan to establish a residence. Jane identified the school Henry would attend in Florida, which was two miles away from her home. She would drive him there as she had purchased a car a month earlier. She was currently working as many as 60 hours per week doing deliveries for InstaCart, but intended to reduce that to 40 hours. Her work schedule was flexible, so she could be available if something came up with Henry.

Jane stated that she was earning enough money to provide for Henry, including food, clothing and shelter, and expected he would be able to obtain insurance through the Florida Family Program. She understood that video games were very important to Henry, naming one of his recent favorites, and stated that her home had the internet capability that would allow Henry to continue his video game habit if he were placed with her. Jane anticipated Henry would be able to maintain his relationship with David over FaceTime and Skype, and she was willing to support David coming to Florida to visit Henry.[12]

Jane explained her reasons for moving to Florida, stating her primary reason was to get away from David. She characterized the situation as "tumultuous," and believed her circumstances had improved "100 percent" by her move to Florida.

SSA moved to introduce the June 2019 report from the Florida case manager, supporting Florida's denial of the ICPC. Jane objected on the basis that it was remote in time. Although the court initially sustained that objection, it later reversed its decision and admitted the report.

---

[12] Jane believed that Henry and David could maintain a positive relationship over FaceTime and Skype. Both David and Henry felt their remote visits were good, and mentioned they were able to play video games together remotely during the visits.

28

In closing argument, SSA argued the court should terminate reunification services and order Henry into long term foster care. SSA pointed out Henry was "stable and doing well in his current placement, [and] that while mother has engaged in services, the problem is she hasn't really been able to make behavioral changes and indicate to the court that she's []able to safely parent Henry. [¶] Part of this has been limited due to her move to Florida; part of this has been limited due to Henry's reluctance at times to engage mother in phone calls, even from Florida; part of it has been mother's own reluctanc[e] to take responsibility for her own actions. [¶] Even in today's testimony, she again indicates that this case came to court because of father's conduct, and doesn't really take responsibility for her own conduct."

SSA claimed that Jane was unable to acknowledge the allegations in the petition about Henry's special needs, asserting that the impediment to Henry's progress and development while in his parent's custody was due "particularly [to] the mother's parenting of him." SSA asserted that Jane's "inability to see [Henry] as a developing teenager and to respect his thoughts and feelings about where he wants to live and the way he wants to visit her is really an extension of the reason why this—or part of the main reason why this case came in, and her inability to meet his special needs." SSA concluded that "any return of Henry to mother would certainly require intensive supervision, and at this time there is no approved I.C.P.C. that would allow for the provision of that type of supervision, Henry cannot be returned to mother's care at this time."

Jane's counsel pointed out that the goal of dependency proceedings is family reunification, and carries a statutory presumption in favor of returning a child to his or her parent. Thus, the burden of proof is on SSA to demonstrate that a return of custody to Jane would create a substantial risk of physical or serious emotional harm.

Counsel summarized Jane's participation in her case plan and argued Jane's lack of progress in certain areas was not sufficient grounds to deprive her of custody in

29

the absence of evidence that returning Henry to her custody would represent a substantial danger to Henry. Counsel acknowledged that Henry did not want to live with Jane, but argued the court could not maintain Henry in foster care based solely on his preference.

The court took the matter under submission and continued the hearing to June 19. On that date, the court ordered that reunification services be terminated, and that Henry remain in long term foster care. The court explained that a decision not to return a child to his or her parent's custody can be based on different circumstances than existed at the time the child was initially removed because "sections 366.21 and 366.22 focus on the minor's well-being at the time of the review hearing rather than on the initial basis for juvenile court intervention."

The court found "that the minor is in a foster home where he has a positive relationship, and removing the minor from that home at this time would risk causing long-term emotional trauma for the minor." The court explained that finding "is supported not just by the minor being happy in his current placement and an expression of his desire not to move away, but also by the number of reports describing the lack of positive interaction between the minor and the mother." The court noted that "the minor, who has special needs, would be ripped out of what is familiar to him, and be forced to move to the other end of the country to a location he does not know and with a parent who he has a tenuous relationship with."

The court added that a "second factor" supporting its decision is "the fact that the minor has not lived with either of his parents for a significant amount of time. In this case the minor was removed from his father in April 2018, and then the mother in August 2018. . . . The minor has been in his current placement since December 5th, 2018."

Despite its earlier statement that "sections 366.21 and 366.22 focus on the minor's well-being at the time of the review hearing rather than on the initial basis for juvenile court intervention," the court then admonished both parents for "the manner in

30

which [each] have conducted himself or herself in relation to the minor's past," citing the allegations of the sustained petitions.

As to Jane's performance during the reunification period, the court stated "that although the mother has participated in services, she has not demonstrated that she's capable of parenting the minor in a safe and healthy manner."

The court also noted that while it "does not judge mom's thought process in getting away from the issues in California, the fact is that her move to the other side of the country has significantly hindered her ability to mend the relationship between herself and her son. [¶] Since removal, there has been a bare minimum improvement in the relationship. Mom has not heeded the words of her son with respect to boundaries. The minor's complaints about his conversations with his mother are eerily similar to the issues contained in the petition that initially led to the court's involvement, and eventually [the] removal of the child from her care."

The court also cited the fact that Florida had declined an earlier ICPC (in January 2019) as a grounds for denying reunification in the case, and suggested it would be fruitless to seek another ICPC because Jane had not yet done the things Florida suggested in declining the first request: "[it] does not find it is safe, reasonable or would be using sound judgment to place this minor in Florida with the mother without appropriate supervision, and this court does not believe that an occasional video chat with Orange County Social Services would be appropriate. [¶] Finally, the court does decline mom's invitation for a continuance while waiting for a new I.C.P.C. as the court has not received evidence that mother has resolved the issues from the prior I.C.P.C. denial, there appears to be no point ordering one at this time. [¶] If circumstances do change, then obviously mom has an option of filing a 388 motion."

31

## DISCUSSION

1.    *Applicable Standards*

Our lengthy factual recitation underscores the challenges presented by this case.  The trial court clearly had its hands full.

Section 361, subdivision (c)(3), governs removal of a child from parental custody.  Removal on the basis of emotional (as opposed to physical) harm requires clear and convincing proof that "[t]he minor is suffering severe emotional damage, *as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others*, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of his or her parent . . . ."  (§ 361, subd. (c)(3), italics added.)

Section 366.21, subdivision (e)(1), governs the review hearing that must be conducted "6 months after the initial dispositional hearing, but no later than 12 months after the date the child entered foster care . . . whichever occurs earlier."  That section requires that "after considering the admissible and relevant evidence, *the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless* the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  *The social worker shall have the burden of establishing that detriment*."  (§ 366.21, subd. (e)(1), italics added.)

As our Supreme Court stated in *In re Marilyn H*. (1993) 5 Cal.4th 295, "[a]t the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody.  At the dispositional hearing, the burden is on the state to prove, by clear and convincing evidence, that removal of the child from the parent's custody is necessary.  At 6–, 12–, and 18–month review hearings the juvenile court must return the child to the custody of

32

the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being." (*Id.* at p. 308.) Consequently, review hearings represent one of the "[s]ignificant safeguards . . . built into the current dependency scheme." (*Id.* at p. 307.)

In *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 (*David B.*), this court explained that "[w]hat SSA was required to establish [at the review hearings] was that releasing [the child] to [the parent's] custody would 'create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.' (Welf. & Inst. Code, § 366.22, subd. (a).) That standard, while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." (*David B., supra,* at p. 789.)

As we noted in *David B.*, a parent cannot be denied custody on the basis that he or she is less than ideal, or—significantly—less ideal than an alternative caregiver might be. "The parents who come through the dependency system are more in need of help than most. If we are lucky, they are parents who can learn to overcome the problems which landed their children in the system, and who can demonstrate the dedication and ability to provide for their children's needs in an appropriate manner. They will not turn into superstars, and they will not win the lottery and move into a beachfront condo two blocks from a perfect school." (*David B., supra,* 123 Cal.App.4th at p. 789.)

Of course, this court acknowledged "[t]his is a hard fact to accept. We are dealing, after all, with children, and the dedicated people who work so hard to help these families are understandably desirous of providing those children the best possible circumstances in which to grow up. But there are times when we have to take a step back

33

and make sure that we are not losing sight of our mandate. We are looking for passing grades here, not straight A's." (*David B., supra*, 123 Cal.App.4th at p. 790.)

*David B.* was recently reinforced by *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, another decision from a panel of this court. With those precedents in mind, we turn to the issue of whether the evidence in this case, and the findings of the juvenile court, are sufficient to support its decision.

2.       *Sufficiency of the Evidence in this Case*

SSA contends that the juvenile court's decision is supported by evidence that Jane "had not substantially progressed on her domestic violence problem—as a perpetrator as well as a victim—and her associated angry, controlling behavior that had caused the child serious emotional harm." This contention echoes the concerns stated by the Florida case manager in refusing the ICPC in June 2019 and is at the heart of the issues before us.

SSA points to the January 2018 incident, which brought the family into the dependency process, as evidence of Jane's perpetrator role. But as we have already discussed, there is insufficient evidence before us to demonstrate Jane was a perpetrator of domestic violence on that occasion. Not only did she deny it under oath, but David conceded in his January 2018 interview with SSA that the reason he called 911 to accuse Jane of domestic violence on that occasion was because he wanted to stop her from leaving him.

Once we acknowledge that fact related to the January 2018 incident, we have to conclude that David's subsequent claims of domestic abuse by Jane—none of which were stated under oath because David never testified at any hearing—do not constitute substantial evidence to support any such finding. (See *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705 (*Constance K.*) ["'Evidence sufficient to support the court's finding "must be 'reasonable in nature, credible, and of solid value; it must actually be "*substantial*" proof of the essentials which the law requires in a

34

particular case'"'"'].)  The evidence causes us to conclude David has a habit of making domestic violence accusations against Jane when she threatens to leave with Henry.  That cannot be characterized as evidence of "solid value."

Additionally, the *only* expert opinion we have in our record regarding the dynamics of domestic violence comes from Jane's domestic violence counselor in Florida.  When the social worker queried her in August 2019 about Jane's refusal to commence a domestic violence program with Valerie Fisher—who was known to the counselor as a provider who worked with perpetrators, rather than victims, of domestic violence—the counselor expressed confusion because "[i]t's hard for us to see someone as a perpetrator and as a victim because while in a domestic violence relationship, one partner is maintaining power and control over another."  Assuming that statement is correct (which we do because it is the only expert opinion in our record), it means that Jane cannot be both the victim and the perpetrator of domestic violence in her relationship with David.

The evidence before us suggests that Jane is the victim of domestic violence in this case, not the perpetrator.  That conclusion is reinforced by the evidence demonstrating that David repeatedly exerted power and control over Jane.  Her repeated efforts to leave him were thwarted by his conduct, including accusing her of domestic violence.  And after David was precluded by court order from living in the family home in the early part of the dependency case, he nonetheless returned.[13]  Later David pressured Jane to give him her portion of the family's disability funds to use toward his unsupervised visitation with Henry, on the basis the money was really "his."  And she did so.  Jane's motivation for doing that may have been her love for Henry, rather than her

---

[13]     It is not our intention to excuse Jane.  When David decided to move back into the family home, Jane should have alerted SSA immediately.  But if Jane was a victim of domestic violence, she was the weaker party within the power dynamic at work in this ill-fated relationship.

subservience to David, but whatever her motivation, it does not suggest she was "maintaining power and control" over David.

Stated simply, there is little or no evidence in this record to suggest that Jane was the perpetrator of domestic violence. Consequently, there is no basis to fault Jane for her unwillingness to acknowledge her role as a perpetrator or to deny her a second ICPC evaluation.

Next, SSA contends that the court's ruling is supported by the fact that Jane "did not sufficiently progress as to her controlling and negative behavior that had triggered the child's anxiety and caused serious emotional harm." That ruling conflicts with our record. David was Henry's primary caregiver prior to the initiation of this dependency matter (while Jane was the family breadwinner); it was David who was characterized as the parent who "enjoys time with [Henry] and [who] may be holding him back from growing up; the child states that he does not want to go to school and he stays home."

The only evidence of Jane's "controlling and negative" behavior at the time of the 18-month review hearing related to her telephone visitation with Henry. There is no evidence that Jane's insistence on maintaining more phone contact than Henry desired caused him to suffer "severe emotional harm," at least as defined in section 361, subdivision (c)(3).[14] Henry found it annoying. That does not meet the statutory standard.

We cannot fault Jane for her desperate attempts to maintain a relationship with Henry via their telephone visits. They constituted her only chance to connect with her son, and her desperation proved prescient as ultimately, both SSA and the court relied on the fact that Jane had not managed to overcome Henry's resistance to her phone calls as a justification for refusing to return him to her custody.

---

[14] Section 361, subdivision (c)(3), states that serious emotional damage is "indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others."

36

In connection with this issue, SSA contends that the juvenile court was "entitled to believe . . . that Mother was annoying and overwhelming," as though that would justify denying Jane custody. It does not. Parents may at times annoy or overwhelm their offspring. Such reactions do not warrant removing a son from his mother or father.

Relying on *Constance K.*, SSA also argues the court's ruling is properly supported by the evidence that it would be "detrimental" for Henry to be transferred from his foster home where he had been positively placed since December 2018. But the pertinent issue in this proceeding is not "detriment." If it were, we might agree that maintaining Henry in his foster placement would be better in many ways than returning him to Jane's custody. The standard for denying Jane custody is whether Henry is likely to suffer serious emotional injury as defined by the relevant statutes. As noted in *Constance K.*, a proper finding of emotional injury might be based on "properly supported psychological evaluations . . . ." (*Constance K., supra,* 61 Cal.App.4th at p. 705.) In this case, our record contains no such evaluations. Indeed, our record is devoid of any psychological evaluations of Henry. Instead, we are limited to the conclusory updates offered by Henry's therapist to the social worker—none of which opine about the potential emotional damage he might sustain if returned to his mother's custody.

SSA alludes in passing to the idea that Jane cannot safely parent Henry due to her continued "enmeshment" with David. We find such criticism unfair in light of the fact Jane moved three thousand miles to Florida to distance herself from David. There is no evidence she ever considered returning to California until she concluded (correctly, as it turns out) that she would get no significant assistance in repairing her relationship with Henry while she lived so far away.

37

Finally, SSA asserts that the court's order can be justified on the basis of its reasonable finding that if Henry were returned to Jane, he would need more supervision than SSA could provide long distance, and that Florida would not provide that supervision. We disagree.

The burden is on SSA to prove its contention with evidence. In our record, there is none. In fact, this very lengthy record is remarkable for its lack of any sworn testimony—or even any formal reports from any third party—to support the positions taken by SSA. The only testimony offered by SSA was that of the social worker who recommended allowing Jane to move to Florida with Henry in July 2018.

The last official word we have from Florida is the June 2019 report from the case manager, explaining its denial of the requested ICPC. That denial was based largely on the case manager's unfounded belief that Jane was the perpetrator of domestic violence in this case. SSA never attempted to correct that misapprehension, even after Jane referred the social worker to her domestic violence counselor, who explained in succinct terms why Jane could not be both the victim and the perpetrator of domestic violence in her relationship with David.

The record reflects that even after that 2019 denial, the Florida case manager remained willing to assist in referring Jane to services. Indeed, Jane completed a parenting course she was referred to by the Florida case manager after the denial of the ICPC. Thus, the available evidence does not support SSA's contention that Florida was unwilling to assist if Henry were returned to Jane's custody in Florida.

Finally, we note that the only evidence pertaining to SSA's ability to supervise this case remotely came in June 2018, when SSA recommended that Jane be allowed to move to Florida with Henry. At that point, even when there was no ICPC in place, SSA appeared to have no reservations about its ability to supervise the case remotely.

## DISPOSITION

Because we conclude the evidence is insufficient to support any of the asserted bases for denying Jane the return of Henry to her custody, we conclude the court erred in its ruling. We consequently reverse that ruling, and remand the case with directions to reconsider the conditions under which Henry will be returned to Jane's custody, and when those conditions are established, to facilitate that return.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.